UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KAREN LEONA BLESSING-HARDY                                    PLAINTIFF

v.                                        CIVIL ACTION NO. 3:15-CV-802-DW

NANCY A. BERRYHILL[1], Acting Commissioner of Social Security          DEFENDANT

## MEMORANDUM OPINION AND ORDER

Plaintiff, Karen Leona Blessing-Hardy (Hardy), has filed a complaint pursuant to 42

U.S.C. §405(g)  to obtain judicial review of a final decision of the Commissioner of Social

Security that denied her application for disability insurance benefits (DIB).  Hardy applied for

DIB on March 26, 2012, alleging that she was disabled as of August 26, 2008, due to

degenerative disc disease of the cervical and lumbar spine accompanied by head and neck pain,

tension headaches, occipital neuralgia and hand and finger numbness/pain (Tr.  245-267,  280).

The Commissioner denied Hardy's claim on initial consideration (Tr. 148) and on

reconsideration (Tr. 153).   Hardy requested a hearing before an Administrative Law Judge

(ALJ) (Tr.156-57).

ALJ Jonathan Stanley conducted a videoconference hearing in Lexington, Kentucky, on

February 19, 2014 (Tr.59-93).[2]  Hardy attended with her attorney, Lisa Ballou (Tr. 59).  Hardy

and vocational expert (VE) Jackie Rogers testified at the hearing (Tr. 64-83, 83-93).  Following

---

[1] Pursuant to the provisions of Rule 26(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill, the current acting Commissioner of Social Security is substituted for former Acting Commissioner Carolyn W. Colvin as defendant in the present suit.

[2] An initial video-conference hearing was held without Hardy being present on September 10, 2013 at which time only the testimony of VE Christopher Riman was taken without objection (Tr. 95-116).

the conclusion of the hearing, ALJ Stanley entered a hearing decision on April 4, 2014 that found

Hardy is not disabled for the purposes of the Social Security Act (Tr. 25-41).

In his adverse decision, ALJ Stanley made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 26, 2008 through her date last insured of December 31, 2013(20 C.F.R. 404.1571, *et seq.*).

3. Through the date last insured, the claimant has the following severe impairments: degenerative disc disease (DDD) of the cervical spine with cervicalgia; degenerative disc disease (DDD) of the lumbar spine with pain; history of tension headaches/occipital neuralgia; and hand and finger numbness/pain (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently push and pull using her upper extremities, bilaterally; can occasionally climb ramps and stairs, but cannot climb ropes, ladders or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; can occasionally reach overhead bilaterally; can frequently handle and finger, bilaterally; cannot work outdoors; and must avoid concentrated exposure to extremes in temperature, loud noise, pulmonary irritants, strobing light and vibration.

6. Through the date last insured, the claimant was capable of performing past relevant work as a sorter/pricer and as an assistant manager. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 26, 2008, the alleged onset date,, through December 31, 2013, the date last insured(20 C.F.R. 404.1520(f)).

(Tr. 27-41).

Hardy sought review of the hearing decision by the Appeals Council (Tr. 13-15). The Appeals Council denied her request for review, finding no reason under the Rules to review ALJ Stanley's decision (Tr.1-7 ). The present lawsuit followed.

### The Five-Step Sequential Evaluation Process

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505(a), 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520(a)(4)(i)-(v), 916.920(a)(4). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. See, Dinkel v. Secretary, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2. See, Higgs v. Bowen, 880 F.2d 960, 962 (6th Cir. 1988); Mowery v. Heckler, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart P of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review**

**A.      Hardy's Arguments**

The primary issue raised by the Plaintiff in her Fact and Law Summary involves her

request for a sentence 6 remand of her case pursuant to 42 U.S.C. § 405(g).  (DN 19,  Plaintiff's

FL&S).  Following the entry of ALJ Stanley's adverse hearing decision on April 4, 2014, Hardy

submitted additional medical evidence to the Appeals Council for its review.  Hardy argues that

the evidence was both new and material and that good cause existed why it had not been earlier

presented to ALJ Stanley.  According to Hardy, the Appeals Council failed to fully and

adequately consider all of the new, material evidence in accordance with 20 CFR §

404.970(4)(b) and SSR 11-1p  so as to require a sentence 6 remand, where the records, if

appropriately considered, reasonably could have led to a different outcome given Hardy's long-

standing complaints of severe back pain beginning in March 2013.

This new evidence Hardy explains included:  (1) treatment records of Dr. Joseph Werner

dated December 3, 2014, which indicated nail-patella syndrome, grade 4 spondylolisthesis with

spinal stenosis, lumbar hyperlordosis and chronic backache (TR 51-57); (2) a lumbar MRI report

confirming grade 3 anterolisthesis secondary to bilateral L5 pars defects (TR 58) and treatment

notes of Dr. Matthew Phillips from May 19, 2014 that reflect that Hardy was scheduled for back

surgery, an L4-S1 decompression and fusion procedure on June 2, 2014 (TR 16-21); (3) a

treatment note of Dr. Phillips with x-ray impression dated April 2, 2014 that noted tenderness

with a step-off in Hardy's spinous process in her lower lumbar spine along with L5/S1 severe

spondylolisthesis(TR 48); and (4) records of Dr. Thomas Loeb from March 13, 2014 that

included a cervical spine x-ray of the same date along with an earlier lumbar x-ray of February 9,

6

2014 confirming grade III to IV slip L5 on the S1 with the cervical x-ray revealing market degenerative disc disease of the cervical spine at the C 5-6, all of which caused Dr. Loeb to refer Hardy to a surgeon for evaluation and to order all lumbar brace lumbar x-ray (TR 51-57). This new, objective imaging evidence and treatment notes explains Hardy confirmed the severity of her back problems, as well as, her complaints of debilitating pain, so that the outcome of her application for DIB may well have been different had ALJ Stanley had available this new and material evidence.

Hardy also argues in addition that the hearing decision of the ALJ is not supported by substantial evidence where the residual functional capacity (RFC) assessment found in finding of fact no. 5 fails to include an adequate narrative discussion as required by SSR 96-8p of her symptom-related, functional limitations due to her lower back pain and the medical findings related to it. Hardy claims that ALJ Stanley "virtually ignored all reference to [her] back condition entirely, as confirmed by his failure to note the results of a September 30, 2011 CT scan of her abdomen and pelvis, which revealed grade 2-to-3 L5-S1 anterolisthesis with bilateral L5 pars defects, noted to be chronic in appearance.

Hardy similarly argues that ALJ Stanley made no mention in his decision of the significant medical treatment on her neck, which included radiofrequency ablation at the C2-C3 on the right in February 2012 and earlier at the C3-C4 on the right in December 2011. Such recurrent and significant cervical spine treatment in the view of Hardy supports the conclusion that her complaints of neck pain were both significant and debilitating. Yet, the ALJ completely ignored this medical history of repeated radiofrequency ablation of her cervical spine in his decision. Consequently, Hardy believes that ALJ Stanley overstated her remaining physical abilities in his RFC determination in finding no. 5. ALJ Stanley's reliance on the assessments of

the state agency physicians and consultative examiner, all of which occurred between May and August 2012, failed in her view to take into consideration the "compelling objective medical evidence [not discovered until 2014 that] contradict[ed] the 2012 opinions and would have led to a different, more limit[ed] RFC" had it been appropriately considered.

**B.**     **The Commissioner's Arguments**

The Defendant, Commissioner Berryhill, has filed a Fact and Law Summary in which she responds to the above arguments.  (DN 21,  Defendant's FL&S).  Defendant begins with Finding of Fact No. 2 in which the ALJ identifies the claimant's severe impairments.  Defendant challenges the notion that ALJ Stanley did not adequately consider the extent of Hardy's severe cervical and lumbar spine impairments.  Because ALJ Stanley found several severe cervical and lumbar spine impairments at step two of the sequential evaluation process, Defendant maintains that the failure of the ALJ to specifically include foraminal stenosis of the cervical spine and anterolithesis of the lumbar spine is at worst harmless error.  *See, Maziarz v. Sec'y of Health and Human Servs*, 387 F.2d 240, 244 (6th Cir. 1987).

Defendant directly disputes the notion that ALJ Stanley failed to consider the Plaintiff's significant treatment for her neck pain in the form of radiofrequency ablation (RFL) or that the ALJ ignored the opinion of Hardy's neurologist that her neck pain was due to radiculopathy and a bone spur at the C5-6 nerve root.  Defendant argues that the ALJ carefully set out the full history of Plaintiff's medical treatment including her RFL procedures at U of L, along with her various MRI studies performed in March 2011, April 2012 and August 2013 all of which revealed only minimal symptoms such as mild degenerative disc disease at the C4-5, and mild straightening with moderate right foraminal stenosis at the C 5-6.  The ALJ, according to

8

Defendant, also carefully documented Plaintiff's history of hospital ER visits with complaints of neck pain, all of which revealed a normal range of motion in her spine and extremities on examination and her complaints were successfully resolved with medication.

Likewise, Defendant maintains that the ALJ did not ignore Hardy's lumbar spine issues in his hearing decision. To the contrary, according to the Defendant, the ALJ set forth in detail Plaintiff's history of back examinations beginning in December 2010 through May 2013, all of which appeared to reflect normal findings such as negative straight leg raising, normal gait, normal muscle strength, heel-toe and tandem walking without difficulty, no motor or sensory deficits and limited complaints of back pain. While ALJ Stanley admittedly did not mention the September 2011 CT scan that indicated grade 2-to-3 L5-S 1 anterolisthesis, the Commissioner maintains that the omission was at worst harmless as there is no indication that this particular imaging supported any additional restrictions in the Plaintiff's RFC, nor was the ALJ required to recite every single item of evidence found in the medical record in his decision explains the Defendant. *See, Bosley vs. Comm'r of SSA*, 397 Fed. App'x. 195, 199 (6th Cir. 2010).

Defendant concludes its Fact and Law Summary with a discussion of the evidence that Hardy presented to the Appeals Council. The Commissioner maintains that the Appeals Council appropriately considered all of the evidence. This evidence the Commissioner points out, most of which post-dated the decision of ALJ Stanley, cannot now be considered on the question of whether the ALJ's decision is supported by substantial evidence. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Further, the Commissioner argues that the evidence does not merit a remand pursuant to sentence 6 of 42 U.S.C. § 405(g). On this final point, Defendant argues that no adequate explanation has been offered by Plaintiff to explain why she could not have obtained and presented the March and early April 2014 reports of Dr. Loeb from spine surgery Associates.

Because ALJ Stanley held the hearing record open for 21 days after the February 19, 2014 hearing date, Plaintiff had ample opportunity according to the Commissioner to supply these medical records, which at most showed only a post-hearing deterioration of her condition so that had they been timely supplied they would not have changed the outcome of the hearing particularly since Hardy's insured status expired on December 31, 2013 four months earlier. Plaintiff cannot meet her burden of proving that she is disabled merely by showing that her condition worsened after the decision of the ALJ according to the Commissioner. *Wyatt v. Sec. of Health and Human Services* 974 F.2d 680, 685 (6th Cir. 1992).

## Legal Analysis

### A.
### Sentence 6 Remand

The first issue we address is whether Hardy is entitled to a sentence 6 remand under 42 U.S.C.§ 405(g)[3]. Such a remand will only be appropriate when the Plaintiff shows that new and material evidence exists, and good cause is shown why such evidence was not presented at the prior administrative hearing. *See, Ferguson v. Comm'r*, 628 F.3d 269, 276 (6th Cir. 2010)(quoting *Foster v. Halter* 279 F.3d 348, 353 (6th Cir. 2001)). Evidence will be considered to be "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id*. Evidence is "material" if there is "a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec. of Health & Human Services*, 865F.2d 709, 712 (6th

---

[3] 42 U.S.C. § 405(g)("The court may . . . remand the case to the Commissioner . . . and it may at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Cir. 1988). Finally, the requirement of "good cause" requires that Hardy demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. Good cause is not shown merely because new evidence was not generated until after the decision of the ALJ. *Richardson v. Comm'r*, 2012 WL 4210619 at *4 (E.D. Mich. Aug. 27, 2012) (citing *Oliver v. Sec. of Health & Human Services,* 804 F.2d 964, 966 (6th Cir. 1986)). The Sixth Circuit has been noted to take a "harder line" on the good cause test. *Richardson v. Comm'r*, No. 11-12605, 2012 WL 4210619 at *4 (E.D. Mich. Aug. 27, 2012)(citing *Oliver v. Sec. of Health & Human Surfaces*, 804 F2d 964, 966 (6th Cir. 1986)).

Treatment which post-dates the relevant time period so as to fall outside of either the alleged onset date or date last insured will not be ordinarily considered unless the Plaintiff is able to establish that this new evidence relates back to the covered time period. *See McCracken v. Commissioner,* No 1:08-CV-327, 2009 WL 2983049 at *3 (S.D. Ohio Sept.14, 2009) ("[M]edical evidence obtained after Plaintiff's insured status expired is not relevant, except perhaps to the extent that it relates back to the covered period."). Evidence of a subsequent deterioration in the claimant's condition that occurred after the administrative hearing that does not relate back is immaterial. *Wyatt v. Sec. of Health & Human Services*, 974 F.2d 680, 685 (6th Cir. 1992)(citing *Sizemore v. Sec 'y of Health and Human Servs*., 865 F.2d 709, 712 (6th Cir.1988)). Allegedly new and material evidence which is largely cumulative of evidence and opinions already present in the record will not be considered to be "material." *Longworth v. Comm'r* , 402 F.3d 591, 598 (6th Cir. 2005).

As always, the burden rests with the Plaintiff, as the moving party, to establish that a remand is appropriate. *Oliver v. Sec. of Health & Human Services,* 804 F.2d 964, 966 (6th Cir.

1986).  Courts may not simply ignore these statutory requirements.  *Hollon v. Comm'r of Social Security,* 447 F.3d 477, 486 (6th Cir. 2006).  A Plaintiff's failure to establish any one of the three requirements – – new, material, and good cause – – is fatal to the request for a sentence 6 remand. *Glasco v. Comm'r,* No. 15-3964, 2016 WL 1460384 at*2 (6th Cir. Apr. 14, 2016).

Here, careful review of the administrative record persuades the Court that Hardy has failed to carry her burden under sentence 6 of 42 U.S.C. § 405(g).  We reach this conclusion for several fundamental reasons.  First, when one considers the nature of the medical treatment records that existed prior to the hearing decision date, it is clear that the post-hearing records at most establish a subsequent deterioration of the claimant's impairments following the expiration of her insured status on December 31, 2013.  Second, certain of the post-hearing treatment records are not "new" evidence, but rather were available prior to the date of the hearing decision and therefore cannot be the basis for a sentence 6 remand.  Both of these considerations are set forth in detail below.

## 1. The Material Pre-hearing[4] Evidence

Hardy at the time of the administrative hearing of February 19, 2014 was a 51-year-old, married mother of three adult children, a high school graduate standing 4'11" tall and weighing 105 pounds.  (TR 63).  Her prior employment history consisted primarily of work at a Goodwill store in Louisville, Kentucky from 1998 until August 26, 2008, where she began work as a production clerk and eventually rose to the job of assistant manager.  (TR 66-67).  Her initial job duties include taking in donations, sorting clothing, cleaning the store, running the cash register, and dealing with customers.  (Id.).  Hardy estimated that her job as production clerk required her

---

[4] The "hearing" referred to in the subheading is that of February 19, 2014 (TR 59-93) rather than the earlier abridged hearing of September 10, 2013 (TR 95-116), which Hardy was not able to attend due to her inability to locate the hearing site on the earlier scheduled date.

to remain on her feet standing for most of the work day and to occasionally lift between 20 and 50 pounds. (TR 68-69). When she became a senior production clerk at Goodwill Hardy supervised disabled employees and provided training for them. (TR 70). Upon becoming assistant manager at the store, Hardy's job duties included making bank deposits, counting out the cash from the cash registers, doing paperwork at night, setting work schedules and on one occasion hiring a new employee. (TR 71-72). Otherwise, the physical requirements of the job remained unchanged. (Id.).

Hardy testified at the administrative hearing that she left her job in 2008 due to headache pain. (TR 72). Hardy explained that she has constant pain in her head and neck along with numbness and tingling in her hands. (TR 73, 79). Although her medicine helps with the pain somewhat, it never fully goes away. Hardy elaborated that while the pain is worst in her head and neck, she has a constant aching pain throughout her body which averages around 7 on a 10 point pain scale. (TR 74). She estimated that she may have five "good" days with reduced pain in an average 30-day month. (Id.). Otherwise she spends most of her time "sitting around a lot" at her parents' home in her mother's recliner chair with her feet elevated. (TR 75).

Hardy does do some chores around the house such as her laundry and the dishes on her good days. (Id.). She is able to take care of her personal needs, but does not drive an automobile although she does have a driver's license. (TR 76). Her father drives her to her doctor appointments and to get her medication; otherwise, Hardy does not go out to shop or socialize due to her daily headaches. (TR 76-77). Hardy estimated that she could stand for approximately 15 minutes, lift approximately 5 pounds and walk less than a block. (TR 78).

Treatment records of Dr. Alur Ashok from July 2008 to April 2009 reflect repeated complaints of headaches (TR 530-532). Hardy reported on July 28, 2008 that she had been to

Immediate Care in Lagrange, Kentucky on five different occasions and to Baptist Hospital Northeast once with head and throat-related complaints. Hardy told the doctor that she was nervous and "stressed," that it felt like her throat was going to close up and that her head felt "funny in back." (TR 531-532). She returned on several occasions during the next month with continued complaints of headache and neck pain. (TR 530-31). Dr. Ashok prescribed Xanax on these occasions (Id.). Hardy's last office visit to the doctor occurred on April 23, 2009. (Id.).

The administrative record reflects no further documented medical treatment until October 21, 2010 when Hardy appeared at the University of Louisville hospital emergency room with complaints of headache and neck pain. (TR 374). On that occasion, Hardy related that her headaches had started two years earlier, and at its maximum severity was described in her words as "moderate." (Id.). Hardy stated that she had similar symptoms "many times." (Id.). She reported that she had recently been seen at a clinic and told that she has "overactive nerves." (Id.).

A "review of systems" was essentially negative except for Hardy's recorded complaints. Physical examination revealed normal range of motion in the extremities, a normal back on inspection, no motor deficits, or sensory deficits. (Id.) Her neck was reported to be not tender to percussion (nttp), supple and without pain on movement. (TR 379). An EKG was normal, as was a CT scan of the head, which revealed no acute changes or bony abnormalities only age-related atrophy. (TR 375, 379). The emergency room physician, Dr. Dorroh Colby's, clinical impression was headache. Hardy was prescribed Neurontin, 300 mg every eight hours, and Fioricet, 2 every 4 hours as needed for headache. (TR 378).

Hardy was initially examined at the U of L Neurology Clinic on December 2, 2010 (TR 424-427). Hardy then complained of head and neck pain for approximately two years sometimes

associated with nausea and visual symptoms. (TR 424). She reported prior attempts at treatment with a chiropractor, which only worsened her symptoms. (Id.). Her reported medications at that time were Prednisone and Xanax. Physical examination of the neck and spine was noted at that time to be normal as was examination of the extremities, muscle strength, sensation, coordination, station and gait. (TR 426-27). Diagnosis was cervical neuralgia along with anxiety/depression. (TR 427). Hardy was prescribed Ellaville, 25 mg as needed and Celexa, 20 mg and referred to the U of L Pain Management Clinic. (TR 427).

Dr. Robert Sasser, Hardy's primary care physician, began treatment of her in mid-February 2011 (TR 412). Her chief complaints on that occasion were headache and neck pain accompanied by tinnitus and numbness in her arms. (Id.). Her medications were noted to be Gabapentin, Amitriptyline and Xanax. (Id.). Treatment notes of Dr. Sasser from July 23, 2011 indicate that Hardy was treated two months earlier at the University of Louisville neurology clinic for acute pain management on May 25, 2011. (TR 408).

Dr. Sujittra Tongprasert examined Hardy along with Dr.Nitin Malhotra. (TR 370-373). Once again, her chief complaints included occipital (back of the head) and neck pain accompanied by arm and leg pain. (TR 370). Treatment notes reflect that Hardy "presented with a complex history and inconsistent pain complaint starting about 2 ½ years ago. (Id.). She reported occasional pain that radiated up to her occiput accompanied by pain down the front of her neck, as well as, pain traveling down her back toward her shoulder with occasional tingling and numbness going down both arms. (TR 370) Hardy could not relate the pain to any specific activities except to say that "if she stayed in any position for a long time, it could elicit that pain." (Id.). Hardy reported no life-changing event that precipitated her pain and had no family history of chronic pain. (Id)

Diagnostic imaging included a March, 2011 MRI of the cervical spine that revealed moderate degenerative disc disease at the C 5-6 along with mild degenerative disc disease at the C4-5 without focal disc herniation or spinal stenosis. (TR 371). An October, 2010 CT scan of the brain demonstrated no acute injury except for moderate cerebral atrophy. (Id). Hardy's past medical history was noted to be positive for anxiety, depression and hypertension. (TR 367, 371). Her gait, balance, and coordination were noted all to be within normal limits as was her motor and sensory function. (TR 371). Straight leg raising test and joint examination were both reported to be negative as was facet loading of both the cervical and lumbar spine. At most, Dr.Tongprasert noted some mild tenderness over the paraspinal muscle of the upper back; however, palpation of the occipital area did not elicit pain. (TR 372). Dr.Tongprasert's impression was "overall, normal examination at this time . . . ." (Id). Because the doctor was unable to rule out some hidden occipital neuralgia, due to Hardy's multiple medications to treat neuropathic pain, and because her "symptoms seem to be controlled at this time," the doctor did not recommend any further intervention except to advise Hardy to stay on her current medication. (TR 372). Otherwise, the doctor did recommend and MRI and MRA of the cerebral cortex to rule out a possible tumor or arteriovenous malformation. (Id.).

Dr. Malhotra also prepared a report of Hardy's May 25, 2011 treatment (TR 366-369). His report describes Hardy's pain as "a throbbing pain and it comes and goes. It is anywhere from a 2 out of 10 pain to a 7 out of 10 pain. This pain radiates down the back of her neck, down her clavicle to her sternum and can radiate down both arms." (TR 366). Hardy reported that her occipital pain could happen independently of these associated symptoms and followed no pattern, nor inciting event. (Id.). Hardy also complained of occasionally sharp, bilateral pain radiating into the lower extremities that caused her weakness and forced her to limp. She also

complained of radiating pain to her temples and "floaters" in her left eye that randomly "come and go." (Id.). She reported that her pain "is better with Gabapentin and or other medication" and that her "symptoms started in 2008 after she quit her job at Goodwill." (Id.). Otherwise, Hardy denied any prior history of headaches, migraines or other such symptoms as well as any personal stressors, falls, family conflict or other traumatic events related to her complaints of pain. (TR 366).

Dr. Malhotra likewise reported normal neurologic examination with normal speech, gait, balance and coordination. Motor function was noted to be 5/5 bilaterally in both upper and lower extremities with negative straight leg raising test bilaterally and SI joints negative to tenderness on palpation. Hardy revealed no cervical facet pain on palpation, extension or rotation and exhibited a full range of motion in her neck. (TR 368). Facet loading of her lumbar spine was reported to be negative bilaterally with no tenderness points. Likewise, palpation of her greater occipital nerve was negative with no reproduction of the neuralgia symptoms reported. (Id.).

Based on Hardy's medical history, examination results and diagnostic imaging, Dr. Malhotra's impression was "migratory pain not consistent with EMG, MRI, fibromyalgia or physical exam findings," adding that "her symptomology is not consistent with occipital neuralgia and [she] would not benefit from occipital nerve injections at this time." (Id.). Dr. Malhotra advised Hardy to continue medical management with Neurontin and follow up with her primary care physician "who should consider a psychiatric referral." (TR 369).

Hardy returned to the U of L Pain Management Center on two occasions in both July and August 2011 each (TR 362-365). She continued to complain of cervical and headache pain. (TR 364-65). On July 20, 2011, Hardy related that she had experienced headaches every day, all day

for three years, which were not improved by Neurontin or Amitriptyline.  (TR 364).  She reported that the "headaches never stop" and that the pain was located in the back and on top of her head.  (Id.).  Once again, physical examination revealed a normal gait, balance, coordination and sensory function.  (Id.).  Treatment notes from July 20, 2011, however, revealed a positive Hoffman sign, an indicator of possible neurological condition such as cervical spondylitis or other forms of spinal cord compression.[5]

August 16, 2011 treatment notes from the U of L Pain Management Center reflect continued complaints of head and neck pain that Hardy rated 3 out of 10 on the pain scale.  (TR 363).  On this occasion, however, she was noted to be "responding well to medical management, but medicines do not take away all the pain."  (Id.).  Physical examination continued to reveal a normal gait with 4/5 motor function in the upper and lower extremities with no indication of spurring, facet loading, trigger points or allodynia (pain resulting from an innocuous stimulus).[6] Straight leg raising test was negative, as well.  (Id)  Treatment notes from two weeks later on August 31, 2011 reflect similar complaints and examination results with the attending physician noting that the doctors were "unable to pinpoint any pathology" to adequately explain Hardy's neck and head pain.  (TR 362).

On September 8, 2011, Dr. Tongprasert and resident physician, Dr. Christopher Spiess, performed a medial branch nerve block to the facet joints at cervical levels C2, C3, C4 of Hardy's cervical spine.  (TR 359).  Hardy agreed to this pain management procedure after reporting that her medication only had minimal effect on her pain symptoms.  (Id.).  Physical examination then revealed pain with facet loading in the cervical region and with bilateral

---

[5]  See, www.mult-sclerosis.org/Hoffmanssign.html (last visited April 18, 2017).
[6] See, http://www.medicinenet.com/script/main/art.asp?articlekey=25197 (last visited April 18, 2017).

flexion and extension of Hardy's neck. Diagnosis on that date was cervical spondylosis with chronic headache pain. (Id.).

The following month on October 20, 2011, Hardy reported a decrease in the severity of her pain to a level of 2 out of 10. (TR 358). Her physical examination once again revealed a normal gait, balance, coordination and 5/5 motor function with a good response to cervical medial branch nerve blocks performed the preceding month being noted. (TR 358). Consequently, a second series of such medial branch nerve blocks to the facet joints of her cervical spine at the C2-3, C3-4 on the right was performed at U of L on November 10, 2011 (TR 354). Treatment notes from that date reflect that the prior nerve block procedure had resulted in a 50% relief of Hardy's pain for four weeks. (Id.). Hardy also discussed with Dr. Jackson the possibility of radiofrequency ablation (RFL) if she responded well to the nerve blocks.

In fact, RFL procedures were performed at U of L on three occasions in November 2011 (TR 355), December 2011 (TR 351) and finally in February 2012 (TR 345). On each occasion, Hardy's diagnosis continued to be cervical spondylosis on the right with chronic headache and neck pain. (It.) On the final occasion, Hardy reported that she continued to have headaches and some neck pain and that she did not get the same relief from the RFL at the C 3-4 that she had obtained with the medial branch blocks. (TR 345). Subsequently when Hardy returned to the Pain Management Center at U of L on March 30, 2012 she reported no relief from the most recent RFL procedure. (TR 344). Nevertheless, physical examination continued to reveal normal gait, balance, coordination and posture with no tenderness at the facet joints and a good range of motion. (Id.).

On April 13, 2012 a cervical MRI of Hardy was performed at the U of L Department of radiology.  (TR 386-387).  Diagnostic imaging of Hardy's cervical spine, with and without contrast, revealed only "mild straightening of the cervical spine" with C5-C6 minimal bony bridging and right uncovertebral spurring causing moderate right foraminal stenosis."  (TR 387)  No significant abnormalities were revealed at the C2-C3, C3-C4 or the C6-C7 and C7-T1.  (TR 386-87).  The cervical vertebral bodies were all noted to be normal in height and signal with only mild degenerative flattening and desiccation along with osteophytic spurring at the C5-C6.  (TR 386).  And "incidental small post inflammatory inclusion cyst was noted in the posterior nasopharyngeal soft tissues."  (TR 386)

Dr. Wayne Herner, a clinical psychologist, performed a consultative psychological examination of Hardy in Louisville, Kentucky on May 21, 2012 (TR 388-394). His consultative psychological report notes that Hardy was referred by the Department of Disability Determinations with complaints of fibromyalgia, vision problems, balance issues, headaches, arthritis, neck and head pain, and "overactive nerves."  (TR 388).  Hardy was observed by Dr. Herner to be alert, oriented and cooperative with the evaluation.  Dr. Herner noted that "she did not appear to be in any significant physical discomfort . . . ." (TR 388).  She revealed no evidence of thought disorder and provided information in a clear and specific manner.  (Id.). Hardy appeared to Dr. Herner to be fully oriented with intact memory.  (TR 389).  It appeared to the doctor that Hardy was functioning within the low average range of intelligence with minor attention problems, intact reasoning and a poor general fund of knowledge.  (TR 390).

Hardy reported to Dr. Herner that her health began to deteriorate four years earlier when she started to experience back and neck pain that she attributed to an inclusion cyst in the posterior nasopharyngeal soft tissue.  (TR 386, 391).  Hardy explained that the pain radiates

down both her arms and that she "found it extremely difficult to find any relief." (TR 391). She advised Dr. Herner that she had been treated at pain management at U of L "with little benefit." (Id.). She reported that, while her medication did help, it did not totally relieve her pain, which caused her to have sleep problems. (TR 391) According to Hardy, her "pain has never gone and she 'hurts all over.'" Hardy did concede to Dr. Herner, however, that she had been told by her treating physicians "that she had 'too many symptoms' for it to be a valid problem." (TR 391). At the time of her psychological examination, Hardy reported her medications to be Amitriptyline, 25 mg; Gabapentin, 800 mg; Propranolol HCL, 20 mg; Tramadol, 50 mg; and Alprazolam, 1 mg. (Id.).

Hardy reported no prior history of mental health treatment and did not report any significant mental symptoms. Her primary difficulty, according to Hardy, was coping with her pain, which she related often makes her cry and forces her to limit her physical activities. (TR 392).

She described her daily activities to include a little cleaning around the house and sometimes cooking. (TR 392). In the summer months, Hardy indicated that she goes outside and works in a garden and flower bed. (Id.). She no longer drives due to "eye floaters." (Id) Although Hardy enjoys being with people, she reported that she does not have as many friends as she once did. (Id). Dr. Herner's diagnosis based on the above information was pain disorder related to fibromyalgia along with an inclusion cyst in the neck and frequent headaches. (TR 393). Dr. Herner found Hardy to be of low average-to-average intelligence with no significant problems with reasoning or memory. He found her attention span to be slightly impaired, but without meaningful functional limitation, nor did she have any problems interacting with others. (Id.).

Medical records reflect that Hardy returned to the U of L Neurology Department on June 12, 2012 at which time she reported to Dr. Walter Olson that her neck and head pain had not been adequately resolved by pain management. (TR 418) Examination by Dr. Olson continued to reveal a normal range of motion in the neck, and normal muscle strength, sensation, gait, station and deep tendon reflexes. (TR 419) Diagnosis remained occipital neuralgia accompanied by cervicalgia secondary to a bony spur at the C 5-C 6 nerve root. (Id.). Hardy was instructed to continue Elavil, Tramadol and Ibuprofen as needed and return for follow-up within three months. (TR 419-420).

On her return to the Clinic on September 18, 2012 Hardy reported that her cervical and occipital nerve blocks at the Pain Management Clinic provided her no relief, contrary to her prior statements to the doctors at the Pain Management Clinic. Hardy was noted to be "really exhausted from all the intervention and is ready to 'cut open' and 'permanent fix it.'" (TR 413). Her physical examination continued to be normal in terms of her muscle strength, gait, station, reflexes, coordination and sensation. (TR 415-416). Hardy was referred to physical therapy and offered a psychiatric evaluation, both of which she refused. (TR 416) Dr. Lolia Mitish discontinued Hardy on Gabapentin, increased the dosage of Hardy's Amitriptyline and ordered an MRI of her brain (TR 416).

Hardy's medical records contain a series of emergency room visits at both Baptist Hospital Northeast and the U of L hospital beginning in January 2013 through May of the same year. (TR 443-448, 449-451, 452-464, 468-469, 477-501, 502-512). On January 14, 2013 Hardy arrived at the emergency room of Baptist Hospital Northeast with complaints of neck pain. (TR 443). Treatment notes reflect that Hardy provided a "long and confusing history of an inflamed cyst in her neck that causes numerous problems." (Id.). She reported that she could "feel the

cyst inside her throat" and that it "is also pushing on her carotid artery causing a 40% blockage." (Id.). She claimed that the cyst caused "poofs of air to come out of her nose and eyes" and that it was "blocking the nerves in [her] neck." (Id.). Hardy reported her pain to be severe in her cervical spine and claimed that nothing relieved it, nor worsened it. (TR 443). A review of systems noted and occipital headache for the past 4 ½ years along with anxiety disorder, hypertension and a cyst. Hardy was noted to be restless, agitated and appeared hostile but otherwise was alert and oriented. (TR 444). Examination revealed no tenderness in her back and a normal range of motion in both her back and extremities. (Id.).

The emergency room physician Dr. Steven Skaggs advised Hardy that her inflamed lymph node could not move, that it was unlikely to have been present for 4 ½ years nor to cause her posterior neck pain, and was not reported on the MRI to be compressing her carotid artery. (Id.) Hardy was noted to become argumentative, and when advised to see a medical specialist for her problems, complained that she had seen numerous doctors, including an ENT specialist, adding that "they won't do anything." (TR 445). Dr. Skaggs concluded that Hardy's "problems are mostly psychological in nature. However she will not be receptive to that suggestion." (Id.). His impression was chronic neck pain, which could continue to be treated by her current medications of Amitriptyline, Amoxicillin, Ibuprofen, and Propranolol. (Id.).

The following week on January 21, 2013, Hardy appeared at the emergency room at the University of Louisville hospital (TR 449-451). Once again, her chief complaint was neck pain. Hardy was noted to be ambulatory, alert, oriented and in no acute distress. (Id.). She was prescribed Flexeril, 10 mg along with Prednisone, 20 mg and instructed to follow up with her primary care physician, Dr. Sasser. (TR 450-451). Her condition was noted to be improved and stable and Hardy reported a pain level of 0/10 on departure. (Id.).

Approximately two weeks later, Hardy returned to the Baptist Hospital Northeast emergency department on February 9, 2013. (TR 452-64). She reported an onset of dull neck pain beginning the prior day described as being moderate in degree and located on the left and right sides of her cervical spine. (TR 453). Physical examination confirmed soft-tissue tenderness on the right and left lower neck area with a normal range of motion in the extremities. (TR 454). An x-ray of the cervical spine taken that date revealed normal alignment with mild degenerative changes at the C4-5 and moderate degenerative changes at the C5-6 along with an anterior osteophyte formation accompanied by moderate disk space narrowing. (TR 459). Hardy, who was noted to be tearful and anxious, had insisted on the x-ray imaging because "something has shifted in [her] neck and will press on her neck and caused her to choke to death." (TR 454). Hardy was prescribed Flexeril, 10 mg, instructed to continue her other current medications and to apply a hot compress intermittently to her neck 3-6 times daily. (TR 454-55).

Hardy appeared at the emergency room of Baptist Hospital East on April 28, 2013 (TR 478-501). As before, her chief complaints consisted of intermittent headache and neck pain. Hardy described her pain as if "the nerves in [her] head [were] pulling like fishing line throughout [her] body." (TR 478). She reported that she could "feel a shaking inside her body" along with the sensation that "her tongue is getting sucked inside her body." (Id.). Hardy denied that her pain was alleviated or worsened by anything. (Id.).

Examination revealed a normal range of motion throughout the extremities, no motor or sensory deficits and normal reflexes. (TR 479, 485). A cervical spine x-ray was noted to reveal "no acute findings" only "mild degenerative changes." (TR 479, 494). Likewise a CT scan of the head was also negative. (TR 475, 493). Her cervical spine x-ray revealed normal disc height and alignment with minimal loss of disk space at the C 5-C 6 with only "some mild degenerative

24

endplate change and osteophytosis at this level." (TR 476). The clinical impression of the treating ER physician's assistant, John Burckle, was (anxiety reaction) along with an "acute urinary tract infection" (TR 483, 498). Dr. Russ Compton agreed with this assessment. (Id.).

On May 3, 2013, Hardy returned to the emergency department at Baptist Hospital East (TR 502-512). As before, her chief complaint was neck pain, which she described as being severe. (TR 503). Hardy was noted to report "a multitude of symptoms" and reported having been examined by her primary care physician numerous times over the past five years without relief. (Id.). Hardy reportedly refused to see her neurologist, Dr. Alt. (Id.). Physical examination of her neck revealed a supple neck with no decrease in her range of motion and no vertebral tenderness (TR 504). Her back appeared to be normal on inspection and she exhibited no sensory or motor deficits. (Id). Her speech, however, was noted to be abnormal (fast, rambling thoughts). Treatment notes reflected that she appeared to have delusions. The ER physician's assistant on that occasion, Eric Elder, noted that he suspected Hardy "has some psychiatric component to her complaints" adding that "her list of symptoms follows no neurologic pathway." (Id.) According to Elder, the clinical picture did not suggest cervical radiculopathy, carotid artery dissection or vertebral artery dissection. (Id.). Nevertheless, Hardy reported her pain level as being 10/10 on discharge. (TR 507).

Five days later on May 8, 2013, Hardy returned to Dr. Sasser with continuing complaints of neck pain. Dr. Sasser referred Hardy to Dr. Steven Reiss. (TR 471, 472-476). Dr. Reiss examined Hardy on July 19, 2013 (TR 472-475). On this occasion, Hardy complained not only of neck pain, headache and numbness, but for the first time, upper back pain as well. (TR 472). Treatment notes reflect complaints of severe occipital headaches with pain radiating into the thoracic spine. (Id). Hardy reported that it felt "like her face and head is getting pulled in many

directions." (Id.). She additionally reported numbness and tingling in her hands and fingers. (Id). Examination revealed her gait and station to be normal with normal muscle strength throughout and normal muscle tone as well as normal sensation and reflexes. (TR 473). The doctor summarized her symptoms as headaches in the occipital region with radiation into the neck, shoulders, mid back and upper lumbar spine. (TR 474). Dr. Reiss ordered an MRI of Hardy's cervical spine without contrast. (Id)

An MRI of the cervical spine without contrast was obtained on August 15, 2013 (TR 513-514). Findings on imaging revealed no significant degree of canal or foraminal narrowing at the C3-C4, C6-C7 and C7-T1. (TR 513). Minimal endplate osteophytic change was seen at the C4-C5 without significant canal or foraminal stenosis. (Id). A mild degree of central canal stenosis, secondary to a disc osteophyte complex, was visualized at the C5-6 along with "a moderate degree of right and a mild degree of left neural foraminal narrowing secondary to uncovertebral joint hypertrophy." (Id.). The cervical spinal cord was noted to have normal signal intensity. (Id.). (TR 513).

On November 26, 2013 approximately one month prior to the expiration of her insured status on December 31, 2013 (TR 27), Hardy return for a follow-up visit to Dr. Olson at the U of L neurology clinic. (TR 515-518) Dr. Olson reported that since her last visit Hardy now had complaints of back pain and reported possible "nail and patella syndrome." (TR 515) Hardy related that she now felt that "her lower back is the reason for all of her problems and would like to get that evaluated." (Id) Dr. Olson's impression was cervicalgia with occipital neuralgia and lower back pain. (TR 517) given Hardy's lower spine issues, the doctor indicated that Hardy would "get x-rays as she can't afford [an] MRI. If the x-ray was determined to be abnormal, Dr. Olson indicated that he would refer Hardy to neurosurgery for possible intervention. (TR 517).

On February 9, 2014 x-ray imaging of Hardy's lumbar spine was obtained (TR 525). X-ray examination revealed mild lumbar scoliosis with moderately severe anterolisthesis of the L5 on S1. Findings further revealed the possibility of "some mild loss of height at the L5 vertebrae. Otherwise, the lumbar disc spaces appeared "relatively well-maintained." (Id.). Dr. Newcomer, the radiologist who interpreted the x-ray images, added that the condition of Hardy's lumbar spine could be better evaluated with a CT scan. (Id.).

Ten days later on February 19, 2014, ALJ Stanley conducted an administrative video hearing at Lexington, Kentucky (TR 59). At the conclusion of the hearing, ALJ Stanley advised Hardy's counsel that the record would remain open for 21 days to allow the claimant time to provide the medical records and x-ray reports related to the x-ray imaging of February 9 . (TR 92-93). Hardy therefore had until March 12, 2014 in which to supplement the record. Hardy during this window of opportunity provided the ALJ with the November 26, 2013 office treatment records of Dr. Walter Olson (TR 515-18, Exh 18F), the office treatment records of Dr. Robert Sasser dated August 13, 2013 to January 29, 2014 (TR 519-524, Exh 19F), the radiology report of the February 9, 2014 lumbar spine x-ray (TR 525, Exh 20F). (TR 46). ALJ Stanley rendered his adverse hearing decision on April 4, 2014 (TR 22-46).

## 2. The Post-hearing Evidence

On May 22, 2014, Hardy's counsel filed a Request for Review of the Hearing Decision form. (TR 14-15). In her request, Hardy explained that medical records unavailable at the time of the hearing documented severe spinal stenosis and that lumbar fusion surgery was scheduled for Hardy at Jewish Hospital in Louisville on June 2, 2014. (TR 14). Hardy further explained that at the time of the February 19 hearing she had only recently obtained "Obamacare." (Id).

She consequently was able to seek treatment with Dr. Matthew Phillips of Spine Surgery on April 2, 2014.

Hardy included with her Request for Review of the Hearing Decision form: MRI lumbar spine imaging results of April 14, 2014 (TR 17-19); CT lumbar spine scan results of the same date (TR 20-21); May 19, 2014 office treatment note of Dr. Matthew Phillips confirming that Hardy was scheduled for a L4-S1 decompression and fusion L4-S1 and TLID L5-S1 at Jewish Hospital on June 2, 2014 (TR 16); the December 3, 2014 treatment notes of Dr. Joseph Werner of the Louisville Bone & Joint specialists (TR 9-11); and the March 13, 2014 treatment notes of Dr. Thomas Loeb and x-ray report (TR 51-58). The Appeals Council exhibit list indicates that it also received additional evidence that consisted of office treatment records of Dr. Ashok dated July 28, 2008 through April 23, 2009 (TR 529-532) , a radiology report of December 9, 2008 from Dr. Ashok, along with a laboratory test report from Dr. Ashok of the same month. (TR 526-27, 528). The Appeals Council in its Notice of Action confirmed that it had examined the above additional post-hearing evidence, but concluded that "This new information is about a later time. Therefore, it does not affect the decision about whether you are disabled beginning on or before April 4, 2014." (TR 2).

Chronological review of these additional records reveals that Hardy appeared at the Loeb Orthopedic Group on March 13, 2014 with complaints of neck and back pain that included referred pain to the extremities (TR 51). Hardy on that occasion reported a medical history of "well over 10 years of low back pain and 5+ years of neck pain." (Id). Hardy, however, acknowledged no persistent weakness or numbness in her arms and legs and had not had consistent physical therapy nor had any bracing. (Id). Nevertheless, she reported a pain level of 8 out of 10 on the pain scale without improvement by medication.

A comprehensive physical examination performed by Dr. Loeb revealed that Hardy had a full range of motion in her cervical spine with minimal tenderness and a normal motor examination as to all upper and lower extremities. (TR 52-53). She was noted to have positive Hoffman's test bilaterally, indicative of possible cervical spondylitis or other forms of spinal cord compression. Dr. Loeb also noted a bone protuberance over the superior sacrum and increased hyperlordosis (forward flexion of the lower spine). (TR 52). Otherwise, Hardy's gait pattern was normal and her straight leg raising negative at 90° both sitting and supine. (Id). She also had negative sciatic stretch and popliteal compression tests with a full, painless range of motion in both hips. (Id). Dr. Loeb noted that her "motor/sensory are intact to both lower extremities." (Id.). X-rays of the lumbar spine taken on March 13, 2014 revealed marked degenerative disc disease at the C5-6 with no spur formation. Hardy otherwise was noted to be neurologically intact. (TR 52, 57).

Due to indication of extreme spondylolisthesis at the L5 on the S1, Dr. Loeb referred Hardy to Dr. Richard Holt for his opinion on whether surgical intervention was then needed, although Dr. Loeb indicated in his treatment notes "I think it is probably not." (Id). Dr. Loeb also ordered Hardy a lumbar support brace and changed her anti-inflammatory medication from ibuprofen to Mobic. He also indicated that he would send Hardy to physical therapy for specialized strengthening of her core, as well as, her upper and lower extremities.[7] (Id). He scheduled Hardy to return in two months. (TR 53).

On April 14, 2014 an MRI of Hardy's lumbar spine without contrast was obtained by Dr. Matthew Phillips along with a CT of her lumbar spine based on her reported history of low-back

---

[7] No post-hearing physical therapy records were submitted to the Appeals Council to confirm that Hardy performed physical therapy as prescribed by Dr. Loeb.

pain and her L5-S1 spondylolisthesis.  (TR 17-19).  The lumbar spine MRI revealed grade 3

anterolisthesis of the L5 on S1 secondary to chronic bilateral L5 pars defects with severe loss of

the L5-S1 disc height ,disc desiccation and canal stenosis at the same level.  (TR 17).  Findings

also indicated endplate degenerative changes most prominent again at the L5-S1 level with

prominent facet degenerative change on the left side at the T10-11.  (Id.).  Otherwise, the lumbar

MRI revealed only mild facet degenerative changes on the right at the L1-2, L2-3 along with

moderate-to-severe facet degenerative changes at the L3-4.  Hardy also was noted to have

levoconvex lumbar scoliosis (left curvature of the spinal column in the lower back) along with an

apparent fusion of the sacroiliac joints bilaterally.  (TR 18)

The lumbar spine CT imaging of the same date revealed grade 2 retrolisthesis of the S1

with respect to the L5 along with bilateral L5 pars defects and very severe bilateral L5-S1 neural

foraminal narrowing.  (TR 21).  Degenerative changes were noted to a lesser extent at multiple

levels of the spine including the T10-11, L2-3, L3-4, and L4-5.  A partial fusion of the bilateral

SI joints also was noted, along with the aforementioned levoscoliosis of the lumbar spine.  (Id.).

Treatment notes of Dr. Phillips dated May 19, 2014 (TR 16) confirm that Hardy was

scheduled for spinal surgery, and L4-S1 decompression and fusion L4-S1 at Jewish Hospital on

Monday, June 2, 2014.[8] The next post-hearing medical records are the December 3, 2014

treatment notes of Dr. Werner (TR 9-11).

Dr. Werner reported that Hardy's chief complaint at that time was back pain, bilateral leg

pain and pain that radiates from the neck to the tail and down the legs, which the doctor indicated

"is mostly lumbar back pain."  (TR nine).  Physical examination of the cervical spine revealed no

---

[8] No medical records of the June 2, 2014 decompression and fusion surgery, however, were supplied to the Appeals
Council, which rendered its adverse decision on August 26, 2015, over a year later (TR 1-4).

palpable or visible deformity, no local spasm and only mild mid-cervical tenderness to deep palpation (Id.). Motor function in the upper extremities was noted to be intact with symmetrical reflexes and sensation intact as well. Sperling test was noted to be negative.

Examination of the lumbar spine revealed it to be hyperlordotic. Hardy exhibited good bending and full hip motion with undisturbed back motion and no tenderness to percussion and palpation in the lumbar spine. (Id.).Dr. Werner, however, did note a deeply furrowed midline surrounded by spastic paraspinal muscles at the lumbosacral junction. Otherwise examination of the lower extremities revealed no evidence of atrophy and undisturbed motor function with sensation symmetrically intact, undisturbed gate and negative straight leg raising. (TR 10). Dr. Werner's impression was grade 4 spondylolisthesis with spinal stenosis, lumbar hyperlordosis and chronic backache along with spinal stenosis and a "garden variety of cervical spondylosis without significant stenosis." (Id.).

Dr. Werner also reviewed the available diagnostic imaging studies. His treatment notes indicate that the x-ray imaging confirmed spondylosis at the L5-S1 with extensive annular bone at the L5-S1 with possible spontaneous fusion of the lumbosacral junction along with lumbar hyperlordosis and scoliosis. (TR 10). The lumbar CT SCAN according to the doctor revealed grade 3-4 spondylolisthesis with degenerative changes at the L4-L5 and bilateral sacroiliac fusions (Id.). The lumbar MRI was noted by Dr. Werner to show severe stenosis at the L5-S1 primarily in the foramina. Based on his examination and interpretation of the diagnostic lumbar imaging, Dr. Werner concluded that Hardy was "a reasonable candidate for T12 to sacral

fusion." (TR 11). He added that Hardy may need to have a bone graft as well. (Id.). His stated goal for such a surgical procedure would be to relieve her leg and back pain.[9] (Id).

As shown above, we have carefully reviewed the additional post-hearing evidence. Based on our review, the Court is compelled to concur with the Appeals Council. The evidence, some of which, such as the March 13, 2014 treatment note of Dr. Loeb, was available prior to entry of the hearing decision on April 4, 2014 but not submitted. Hardy therefore cannot show good cause for her failure to provide ALJ Stanley with this particular treatment record, which in any event does not appear supportive of her argument that she satisfied the requirements for a finding of disability prior to December 31, 2013.

Further, the remainder of the post-hearing medical records and diagnostic imaging reports, appear to the Court to relate to a subsequent deterioration of Hardy's lumbar spine condition, which was not the subject of her subjective complaints or ongoing treatment prior to the expiration of her insured status on December 31, 2013. Prior to that date, Hardy's complaints focused exclusively on radicular head and neck pain without any significant complaints of lumbar pain or limitation. (TR 363-364, 366, 370, 374, 412, 419, 424, 443, 445, 449, 453, 471, 478, 503). Repeated physical examinations by various emergency room, neurology, orthopedic and pain management clinic physicians revealed no limitation in her lumbar spine range of motion, the muscular strength of her lower extremities or in her sensation. (TR 344, 358, 363-364, 368, 371-72, 375, 379, 415-416, 419, 426-427, 473, 479, 485, 504).

Hardy repeatedly exhibited negative straight leg raising tests and had no tenderness to palpation in her lower back. (Id.) Her gait, station and ambulation were repeatedly noted by

---

[9] Nowhere in the December 3, 2014 treatment notes of Dr. Werner is there any reference to the prior scheduled decompression and fusion surgery to be performed at Jewish Hospital on June 2, 2014, nor does the record reveal whether Hardy had any subsequent spinal surgery after her Dec 3, 2014 exam by Dr. Werner.

various physicians and physicians' assistants to be normal. (Id.) Her lower back prior to the expiration of her insured status simply did not appear to be of any significant concern to either Hardy or to her treating physicians, who at most did on occasion note lumbar lordosis, an excessive inward curvature of the lower spine. None of these medical professionals however assessed any physical limitations based on that condition. Not until November 26, 2013 did Hardy attribute her chronic pain complaints to her lower back when she returned to Dr. Olson. (TR 517). It was only then that Hardy first expressed the view that "her lower back is the reason for all of her problems . . ." (TR 515). Even then x-ray imaging of her lumbar spine on February 9, 2014 revealed only mild lumbar scoliosis with moderately severe anterolisthesis of the L5-S 1. (TR 525).

Given this medical history, it is hardly surprising that ALJ Stanley made little mention of Hardy's lower back in his otherwise highly detailed, 17-page hearing decision (TR 25-42). Hardy herself made only one mention of lower lumbar pain being the source of all her problems in the month prior to the expiration of her insured status. (TR 515). More importantly, Hardy simply exhibited no meaningful limitations related to her lumbar spine on repeated physical examinations during the nearly five and a half years between her alleged onset date on August 26, 2008 and the expiration of her insured status on December 31, 2013. In fact, she repeatedly declined treatment with physical therapy, or to consider the possibility that there might be a psychological component to her complaints in view of her anxiety disorder. Thus, even if we assume that all of the post-hearing evidence is new and that good cause existed for Hardy's failure to provide it to ALJ Stanley prior to the date of his hearing decision on April 4, 2014, the evidence related to her lumbar spine at most shows a subsequent deterioration that imposed no meaningful exertional limitations on her prior to December 31, 2013.

A remand pursuant to sentence 6 under such circumstances would not be appropriate, as the cited cases below repeatedly reflect. *See, Fegley v. Colvin*, No. 3:13–cv–01760, 2015 WL 1636045 at * 3 (M.D. Pa. Apr. 8, 2015)(evidence of post-hearing lumbar discogram performed six months after adverse hearing decision failed to meet the materiality standard required for remand pursuant to sentence 6 where at most it related to subsequent deterioration of otherwise previously non-disabling condition); *Caldwell v. Astrue,* No. 4:12 CV 2172, 2013 WL 3245336 at *21 (N.D. Ohio June 26, 2013)(post-hearing MRI that revealed spurring and severe stenosis, while new, was not material where it did not relate to the period before the date on which the ALJ rendered his adverse decision); *Fleshood v. Astrue*, 2010 WL 3893949 at *7 (E.D. Va. Sept. 8, 2010)(physician's post-hearing report dated approximately one year after adverse hearing decision, which documented severe osteoarthritic lumbar spine impairment, was not "material" for purposes of sentence 6 where report failed to show how the impairment affected the claimant prior to the expiration of his insured status and, at most, addressed only subsequent deterioration of previously non-disabling condition), *recommendation adopted*, *Fleshood v. Astrue,* 2010 WL 3893945 (E.D. Va. Oct. 1, 2010).

The same conclusion applies here with equal force, the additional evidence supplied by Hardy is not material as it does not reveal additional work-related limitations present during the relevant period prior to the expiration of her insured status on Dec. 31, 2013. Further, to the extent that Hardy appears to argue that the new evidence would have in some fashion affected the credibility determination of the ALJ, the law is well established that such credibility determinations are to be afforded substantial deference by the federal courts.

An ALJ properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that

credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004). The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight, and judicial deference will be given to the ability of the ALJ to observe the demeanor and credibility of the witnesses. *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)). Yet, the ALJ is not accorded absolute deference. His or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y,* 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters,* 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." Id. (citing Rogers, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers,* 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the aforementioned factors of: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side

effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. Id. at 823 n. 14 (citing SSR 96-7p).

Also included among the evidence that the ALJ must consider when making a credibility determination are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. Id.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning,* 661 F. Supp.2d at 823. The reviewing court does not make its own credibility determinations. *Franson v. Comm'r,* 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing Walters, 127 F.3d at 528)). The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility." *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994)). Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill

battle.'" *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Here, Hardy has not won the uphill battle. ALJ Stanley thoroughly considered her medical history, hearing testimony, objective test results and activities of daily living in his evaluation of her credibility at pages 6-15 of his hearing decision (TR 30-39). His credibility determination is fully supported by the record. For example, Hardy related in her Disability Report (TR 279-86) and in her Function Report (TR 302-310) that despite her severe impairments of degenerative disc disease accompanied by occipital neuralgia she remained capable to perform some household chores, occasionally prepare meals, do her laundry, care for a pet cat and work in the garden and flower bed in the summer months (TR 75-76, 302-310, 392).

ALJ Stanley also correctly noted the inconsistency in Hardy's various statements concerning her driving habits (TR 31). Hardy's medical history contained "significant gaps" as noted by the ALJ at page 7 of his hearing decision (TR 31, 374). Both ALJ Stanley and Dr. Herner noted that despite Hardy's complaints of daily, unrelenting pain of disabling intensity she did not appear to be in any discomfort in their presence (TR 31, 388). Further, various emergency room and other medical providers noted that there appeared to be a psychological component to her complaints of pain. (TR 369-370, 416, 445, 483, 504). Nevertheless, Hardy declined a recommended psychiatric evaluation, as well as, repeated referrals for physical therapy for her head and neck pain. (TR 369, 416.).

Hardy's statements to various medical providers concerning the effectiveness of her pain medication likewise were inconsistent at times, as well. (TR 344, 354, 358, 359, 363, 364, 366, 391, 413, 450-51). It is noteworthy that Hardy also could not identify any activity that

precipitated, aggravated or otherwise militated her pain. (TR 366, 370, 478). Even Hardy acknowledged that various medical sources had told her that she had "too many symptoms." (TR 391, 503-504). Yet, repeated physical examinations revealed her to have a normal range of motion in all her extremities, normal muscle strength, normal reflexes, normal gait, normal station and normal ambulation. (TR 344, 358, 363-364, 368, 371-72, 375, 379, 415-416, 419, 426-427, 473, 479, 485, 504). Accordingly, not only does substantial evidence support the credibility determination of ALJ Stanley, the post-hearing evidence does not significantly undermine that determination in any meaningful fashion.

**B.**

**Severe Impairments**

The next matter the Court considers is Hardy's argument that ALJ Stanley erred in failing to include in Finding of Fact No. 3 her impairments of foraminal stenosis of the cervical spine and anterolisthesis in the lumbar spine among the other identified severe impairments (DN 19,p. 2). ALJ Stanley at step two of the sequential evaluation process found that Hardy had severe impairments that included degenerative disc disease of both her cervical and lumbar spine along with a history of cervicalgia, occipital neuralgia and numbness/pain in the hands and fingers (TR 27). The question now is whether his failure to include the above conditions among the severe impairments warrants relief.

Hardy bears the burden at step 2 of the evaluation process to demonstrate that she suffers from medically determinable physical impairments based on medical science and laboratory findings. *See, Watters v. Comm'r*, 2013 WL 3722099 at *2 (6th Cir. July 17, 2013) (citing SSR 96-4p, 1996 WL 374187 at*1). To meet this burden, Hardy must show that she has an impairment that has lasted or is expected to last for a continuous period of at least 12 months and

that the impairment significantly limits her ability to do basic work activities. *Harley v. Comm'r*, 485 Fed.Appx. 802, 803 (6th Cir. June 25, 2012) (citing 20 C.F.R. §§404.1509, 404.1521, 416.909, 416.921). As the Commissioner correctly notes, however, the mere diagnosis of a condition does not thereby establish its severity. *Higgs*, 880 F.2d at 863; SSR 96-8p, 1996 WL 374184 at *2-3 (1996) (The functional limitations caused by a claimant's impairment are what establishes the severity of those impairments at step 2).

Basic work activities are defined by federal regulation to include those abilities and aptitudes necessary to do most jobs such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as understanding, carrying out and remembering simple instructions and responding appropriately to supervision, co-workers and usual work situations. See 20 C.F.R. §§404.1521(b), 416.921(b). *See, Helm v. Comm'r*, 405 Fed. Appx. 997, 1001 (6th Cir. Jan. 4, 2011) ("A claimant must do more than show that he is severely impaired. To support a finding of disability, the impairment must result in functional limitations.").'

The severity regulation at step 2 of the sequential evaluation process is considered in this circuit to be a "de minimis hurdle." *Rogers v. Comm'r*, 486 F.3d 234, n.2 (6th Cir. 2007). It is intended to "screen out totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985). Consequently, if a claimant's impairment has more than a minimal effect on the ability of a claimant to do basic work activities, then the ALJ must treat the impairment as being severe. *Nejat v. Comm'r*, 359 Fed. Appx. 574, 576-77 (6th Cir. Dec. 22, 2009) (citing SSR 96-3p 1996 WL 374181 at *1 (1996)).

Once an ALJ makes a finding that even one of the impairments of a claimant is severe, then the ALJ "must consider limitations and restrictions imposed by all of the individual's impairments, even those that are not severe." Id. (citing SSR 96-8p, 1996 WL 374184 at *5).

Accordingly, if the administrative law judge considers all of a claimant's impairments at the remaining steps of the sequential evaluation process, the failure of the ALJ to include additional impairments as being "severe" at step 2 of the process "does not constitute reversible error." *Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987). That is exactly what occurred in the present case – – the ALJ failed to include Hardy's foraminal stenosis of the cervical spine and anterolisthesis in the lumbar spine among the other identified severe impairments. Examination of the hearing decision reveals, however, that ALJ Stanley properly considered both conditions in determining whether Hardy had carried her burden to establish that the functional at limitations imposed by her severe impairments precluded the possibility of all substantial gainful activity. Accordingly, his oversight was at worst harmless error. *Id.*

## C.

### Vocational Testimony

The final question addressed by the Court is whether Hardy carried her burden to show that her severe impairments imposed such substantial functional limitations that she was unable to return to her past relevant work as assistant manager at Goodwill. ALJ Stanley not only found that Hardy retained the RFC to return to her former job, he also found in the alternative that she could perform other work existing in the national and local economy given her RFC, age, education and work experience considered in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 used as a framework for decision-making. Based on the testimony of VE Jackie Rogers (TR 83-93) ALJ Stanley found that Hardy remained able to perform such alternative light exertional jobs as sales clerk, customer service representative, cashier and office helper. (TR 41).

The testimony of a vocational expert may be substantial evidence to support the decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant. *Ealy v. Comm'r*, 594 F.3d 504, 512-13 (6th Cir. 2010) (citing *Varley v. Sec'y*, 820 F.2d 777, 779 (6th Cir. 1987)). The hypothetical question to the V.E. is not required to include a list of all the claimant's medical conditions. *Wadd v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004). The hypothetical question also need not incorporate those limitations asserted by the claimant that are properly rejected by the ALJ based on his independent review of the record. *Foster v. Halter*, 279 F.3d 348, 356-57 (6th Cir. 2002). The ALJ also may present a hypothetical to the V.E. on the basis of the ALJ's assessment of the claimant's credibility. *Jones v. Comm'r*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citing *Townsend v. Sec'y*, 762 F.2d 40, 44 (6th Cir. 1985)). Nevertheless, if the hypothetical to the V.E. does not accurately portray the claimant's physical and mental limitations, the testimony of the V.E. will not be substantial evidence to support the Commissioner's decision. *Ealy,* 594 F.3d at 512-13.

Here, where the various hypotheticals presented to the VE by ALJ Stanley accurately portrayed Hardy's physical and mental limitations, the Court concludes that no serious question exists that the decision of the Commissioner is supported by substantial evidence and in compliance with the controlling law. Accordingly for all of the reasons set forth above, the decision of the Commissioner shall be affirmed and the complaint dismissed with prejudice by separate judgment.

Cc:     Counsel of Record.